# Exhibit B

EXHIBIT 21

10-K 1 vplm-10k_093017.htm ANNUAL REPORT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☒ Annual Report Pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934
For the fiscal year ended: September 30, 2017

or

☐ Transition Report Pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934

Commission File Number: 000-55613

# VoIP-PAL.COM INC.
(Exact name of Registrant as specified in its charter)

| **Nevada** | **980184110** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**10900 NE 4th Street, Suite 2300**
**Bellevue, WA, 98004**
(Address of principal executive offices)

**1-888-605-7780**
(Registrant's telephone number, including area code)

Check whether the Registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to the filing requirements for at least the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer", "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| (Do not check if a smaller reporting company) | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The market value of the voting stock held by non-affiliates was $41,185,448 based on 823,708,969 shares held by non-affiliates. These computations are based upon the closing sales price of $0.05 per share of the Company on OTC Markets, Inc. on March 31, 2017.

Indicate the number of shares outstanding of each of the Registrant's classes of common equity, as of the latest practicable date:

| Class | Outstanding as of January 10, 2018 |
|---|---|
| Common Stock, $0.001 par value per share | 1,238,321,197 |

**TABLE OF CONTENTS**

| Item 1. | Business | 3 |
|---|---|---|
| Item 1A. | Risk Factors | 8 |
| Item 2. | Properties | 9 |
| Item 3. | Legal Proceedings | 9 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 10 |
| Item 6. | Selected Financial Data | 11 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 11 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 13 |
| Item 8. | Financial Statements and Supplementary Data | 14 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 29 |
| Item 9A. | Controls and Procedures | 29 |
| Item 9B. | Other Information | 30 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 31 |
| Item 11. | Executive Compensation | 32 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 32 |
| Item 13. | Certain Relationships and Related Transactions. | 33 |
| Item 14. | Principal Accounting Fees and Services | 33 |
| Item 15. | Financial Statements and Exhibits | 33 |

# PART I

## CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS

In this Annual Report, references to "VoIP-Pal," "VPLM," the "Company," "we," "us," and "our" refer to VoIP-Pal.Com Inc., the Registrant.

This Annual Report on Form 10-K (this "Annual Report" or this "Report") contains certain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act of 1934, as amended (the "Exchange Act"). All statements, other than statements of historical facts, included in this Annual report are forward looking statements, including, without limitation, statements regarding our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management. These forward-looking statements may be, but are not always, identified by their use of terms and phrases such as "anticipate," "believe," "estimate," "expect," "intend," "may," "project," "plan," "will," "shall," "should," "could" and "potential," and similar terms and phrases, including when used in the negative. Although we believe that the expectations reflected in these forward-looking statements are reasonable, they do involve certain assumptions, risks and uncertainties. Actual results could differ materially from those anticipated in these forward-looking statements. You should consider carefully the risks described under the "Risk Factors" section of this Annual Report and other sections of this report, which describe factors that could cause our actual results to differ from those anticipated in the forward-looking statements. All forward-looking statements are expressly qualified in their entirety by the cautionary statements in this paragraph and elsewhere in this Annual Report. Other than as required under the securities laws, we do not assume a duty to update these forward-looking statements, whether because of new information, subsequent events or circumstances, changes in expectations or otherwise.

**Item 1.          Business.**

The Company was incorporated in the state of Nevada in September 1997 as All American Casting International, Inc. and changed its name to VOIP MDU.com in 2004 and subsequently to VoIP-Pal.Com Inc. in 2006. Since March 2004, the Company has been in the development stage of becoming a VoIP re-seller, a provider of a proprietary transactional billing platform tailored to the points and air mile business, and a provider of anti-virus applications for smartphones. In 2013, Voip-Pal acquired Digifonica International (DIL) Limited ("Digifonica"), to fund and co-develop Digifonica's patent suite.

Voip-Pal is a technical leader in the broadband Voice-over-Internet Protocol ("VoIP") market with the ownership and continuing development of a portfolio of leading-edge VoIP Patents. Voip-Pal's primary products are VoIP-related patented technology. The Company has spent several years testing and developing this technology. The Company is currently seeking to monetize the patents through a corporate transaction, an asset sale, or licensure of its products.

Voip-Pal's intellectual property value is derived from ten issued USPTO patents. Voip-Pal inventions described in these patents provide the means to integrate VoIP services with any of the legacy telecommunications systems to create a seamless service using either legacy telephone numbers or IP addresses, and enhance the performance and value of VoIP implementations worldwide.

Voice over IP (Internet Protocol), or VoIP, has been and continues to be a green field for innovation that has spawned numerous inventions, greatly benefitting consumers large and small across the globe. VoIP is used in many places and by every modern telephony system vendor, network supplier, and retail and wholesale carrier.

Digifonica was founded in 2003 with the vision that the internet would be the future of all forms of telecommunications. Digifonica assembled a team of twenty top engineers with expertise in Linux and Internet telephony, who set out to develop solutions for future connectivity using the internet. The team developed and wrote a software suite that would later be patented by the USPTO with applications that provided solutions for five core areas of internet connectivity:

- Routing, Billing and Rating
- Lawful Intercept
- Short Number Dialing (Enhanced 911)
- Mobile Gateway
- Uninterrupted Mobile Prototype

In order to properly test the applications, Digifonica built and operated three production nodes in Vancouver, Canada (Peer 1), London, UK (Teliasonera), and Denmark. The Company has a pilot system available for test and demonstration as part of its current technology activities.

Upon successfully developing the technology, Digifonica filed for patents with the USPTO. All of Digifonica's patents have been allowed. Thorough prior art searches have found there to be no existing prior art. On August 27, 2015, the USPTO allowed the last of Digifonica's ten major patents. Voip-Pal considers patent US 8,542,815 "Producing routing messages for voice over IP communications" and its continuation patent, US 2013-0329722 (Application 13/966096, Notice of Allowance 8/27/2015), to be fundamental.

---

3

Due to the fundamentality of Digifonica's Routing, Billing and Rating patent and its messaging continuation patent, usage of the technology may be widespread throughout a variety of telecommunications applications. Accordingly, Voip-Pal and Digifonica consider themselves to have a stake among the vast subscribership which utilizes its routing and call classification technology for all applicable voice, messaging and internet payments employing messaging routing classifications. The Company is currently seeking to monetize the patents through a sale or licensure.

The Issuer's primary and secondary SIC Codes are 4813 and 4899.

The Issuer's fiscal year end date is September 30.

<u>Principal Products or Services</u>

Voip-Pal's intellectual property value is derived from ten issued USPTO patents; including five parent patents, one of which is foundational and the others build upon the former. Voip-Pal inventions described in these patents provide the means to integrate VoIP services with any of the Telco systems to create a seamless service using either Legacy telephone numbers or IP addresses, and enhance the performance and value of VoIP implementations worldwide. Voip-Pal patented technology provides: Universal numbering ubiquity; Network value as defined by Metcalfe; the imperative of interconnect, termination, and recompense for delivery of calls by other networks; Regulatory compliance in regulated markets; Interconnection of VoIP networks to mobile and fixed networks; and Maintenance of uninterrupted VoIP calls across fixed, mobile, and Wi-Fi networks.

Voice over IP (Internet Protocol), or VoIP, has been and continues to be a greenfield for innovation that has spawned numerous inventions, greatly benefitting consumers large and small across the globe. Brands such as Vonage, Skype, and Magic Jack are well-known retail VoIP implementations. However, VoIP is used in many other places that we may not realize and by practically every modern telephony system vendor, network supplier, and retail and wholesale carrier.

Whether a call is placed directly through a VoIP service retailer or a long-distance call is made over a traditional phone system or mobile carrier, it is likely that VoIP is employed somewhere in the stream. In everyday communications VoIP is rapidly expanding towards ubiquity. Wherever a metered VoIP call is routed, it is likely already benefitting from a Voip-Pal invention.

<u>About Voip-Pal's Patents</u>

**Lawful Intercept (LI)**: ("Intercepting VoIP communications and other data communications") US Patent Application, Publication No. **20100150138,** (<u>Link to Lawful Intercept USPTO filing</u>): This patent was issued on April 16, 2013 as US Patent No. 8,422,507. Lawful Intercept Continuation patent application was filed with the USPTO. This Continuation leverages patented technology for instant and text messages, and inherits the same Priority date of November 29, 2007. A Response in Europe has also been filed. Lawful Intercept is a revolutionary technology that addresses the national and international demands by governments to enable law agencies the ability to perform scheduled and live intercepts on VoIP telephone conversations. Network Service providers such as Skype may soon want to be in compliance with government regulations regarding Lawful Intercept. The advantage of this patent is that it is truly undetectable by the intercept target; as opposed to many prior art technologies. Various governments are considering legislating Lawful Intercept as a mandatory technology for any VoIP provider.

**Routing, Billing and Rating engine (RBR)**: ("Producing routing messages for VoIP communications") US Patent Application, Publication No. **20100150328,** (<u>Link to RBR USPTO filing</u>): This patent was issued on September 24, 2013, as US Patent No. 8,542,815. A Response to Europe has also been filed. The Company believes that this patent application technology will be the foundation of any modern commercial VoIP system. It is an essential patent to all VoIP communications. RBR has taken millions of investment dollars and several years to develop and solidify into perhaps the most important architectural solution for VoIP.

**Mobile Gateway**: US Patent Application, Publication No. **20110122827,** (<u>Link to Mobile Gateway USPTO filing</u>): This patent was issued on January 14, 2014 as US Patent No. 8,630,234. The Company believes that Mobile Gateway technology can be applied to any modern cell phone allowing Internet calls to be transparent for the users. All current commercial techniques for making cell phone Internet calls require the users to make additional actions, which are not necessary with the Mobile Gateway patent application. Mobile Gateway is a sophisticated application that uses a telephone's existing mobile network and accesses local reserved phone numbers from the call origination site, thus enabling the user to make a long distance or international call at the local call billing rate.

**Enhanced 911**: ("Emergency Assistance calling for VoIP communications") US Patent Application, Publication No. **20100172345,** (<u>Link to Enhanced 911 USPTO filing</u>): This patent was issued on September 17, 2013 as US Patent No. 8,537,805. Enhanced 911 technology satisfies the major requirement for the emergency response system which is the ability to call back the person making an emergency call to 9-1-1 in the event of a dropped connection. Currently 70% of all emergency calls to 9-1-1 are made via mobile or

VoIP telephones and that number continues to increase. The major challenge for emergency response personnel is the ability to trace the call from a 911 mobile or VoIP caller since wireless telephones are not linked to a fixed location or address.

4

**Advanced Interoperability Solutions**: ("Uninterrupted Transmission of Internet Protocol Transmissions during Endpoint Changes") US Patent Application, Publication No. **20120170574,** (Link to Advanced Interoperability Solutions USPTO filing): This patent was issued on March 18, 2014 as US Patent No. 8,675,566. This technology demonstrates the future of Internet voice communication – calls should not be dropped when roaming from one transport provider to another. The Uninterrupted Transmission technology allows for seamless transition from one Internet access point to another providing continuous, uninterrupted connectivity of a mobile device.

**Allocating Charges for Communications Services:** US Patent Application, Publication No. **20140016764** (Link to Allocating Charges for Communications Services USPTO filing): This patent was issued on July 8, 2014 as US Patent No. 8,774,378, as a continuation to US Patent 8,542,815 (RBR). The technology protected by this patent strengthens the RBR patent and enhances the billing aspect of the RBR and its implementation. The Company believes that this technology will play a vital role as VoIP communications replaces legacy telephony and new fees and tariffs are assessed. System vendors, network providers, and mobile carriers are able to utilize this routing and metering technology to make VoIP more manageable and reliable.

**Intercepting Voice Over IP Communications and Other Data Communications**: US Patent Application, Publication No. **20130229950 A1** (Link to Intercepting Voice Over IP Communications and Other Data Communications): This patent was issued on September 22, 2015 as US Patent No. 9,143,608, as a continuation to Lawful Intercept, Patent No**.** 8,422,507. The technology associated with this newly allowed patent application strengthens the original Lawful Intercept patent and broadens the scope of its practical implementation. It provides a means to not only stealthily intercept phone calls, but also SMS, (text messages) MMS, (multimedia or picture messages) and video chat in real time.

**Uninterrupted Transmission of Internet Protocol Transmissions during Endpoint Changes**: US Patent Application, Publication No. 2014-0153477 A1 (Link to Uninterrupted Transmission of Internet Protocol Transmissions During Endpoint Changes); This patent was issued on October 6, 2015 as US Patent No. 9,154,417, as a continuation to the Advanced Interoperability Solutions, Patent No. 8,675,566. The technology associated with this newly allowed patent strengthens the parent patent in its implementation to maintain seamless communication and transition from one internet access point to another providing continuous, uninterrupted connectivity of a mobile device.

**Determining a Time to Permit a Communications Session to be Conducted:** US Patent Application, Publication No. **2014-0010119 A1** (Link to Determining a Time to Permit a Communications Session to be Conducted); This patent was issued on September 15, 2015 as US Patent No. 9,137,385, as a continuation to US Patent No. 8,542,815 (RBR). The technology protected by this patent strengthens the RBR patent and enhances the timing aspect of the RBR and its implementation. The Company believes the technology protected by the RBR patent and its continuation patents are foundational to all forms of VoIP communications.

**Producing Routing Messages for Voice Over IP Communications (RBR Messaging Continuation):** US Patent Application, Publication No. **2013-0329722 A1** (Link to Producing Routing Messages for Voice Over IP Communications); This patent was issued on November 3, 2015 as US Patent No. 9,179,005 as a continuation to US Patent No. 8,542,815 (RBR). The technology associated with this newly allowed patent strengthens the parent patent with regards to messaging. With the rapid rise of messaging as a principal form of communication, the Company believes this messaging continuation patent and the parent RBR patent are foundational to VoIP communications. Preceding the allowance of this patent the Company successfully completed a thorough and extensive prior art search to assure patent integrity.

**Intercepting Voice Over IP Communications and Other Data Communications**: US Patent Application, Publication No. 20150358470A1 (Link to Intercepting Voice Over IP Communications and Other Data Communications) A third notice of allowance by the USPTO was mailed for this patent Application No. 14/802,929 on July 25, 2016. It is the second continuation to the parent Lawful Intercept, Patent No**.** 8,422,507, and the third in the Lawful Intercept group of patents. The technology associated with this newly allowed patent application strengthens the original Lawful Intercept patent and the previously issued continuation in that it broadens the scope of their practical implementation. The patent provides a means to stealthily intercept VoIP phone calls, SMS, (text messages) MMS, (multimedia or picture messages) and video chat in real time. The ability to stealthily intercept messaging could play a vital role in security, counter-terrorism efforts and law enforcement. Over the past several years messaging has become the leading form of wireless communication with billions of text messages sent each day and trillions each year.

**Uninterrupted Transmission of Internet Protocol Transmissions during Endpoint Changes**: US Patent Application, Publication No. 2015-0327320 A1 (Link to Uninterrupted Transmission of Internet Protocol Transmissions During Endpoint Changes); A third notice of allowance by the USPTO was mailed for this patent Application No. 14/802,872 on August 17, 2016. It is the second continuation to the parent Uninterrupted Transmission of Internet Protocol Transmissions During Endpoint Changes, Patent No. 8,675,566, and the third in the Advanced Interoperability Solutions group of patents. The technology associated with this newly allowed patent strengthens the parent patent and the previously issued continuation in their implementation to maintain seamless communication and transition from one internet access point to another providing continuous, uninterrupted connectivity of a mobile

device. The demand for uninterrupted connectivity provided by this group of patents continues to increase significantly with the rise of Mobile Virtual Network Operators (MVNO) which rely on uninterrupted call transfer as they provide calling and data services using multiple carriers and Wi-Fi networks allowing calls to transition from Wi-Fi connections to cell phone networks seamlessly.

5

**Emergency Assistance Calling for Voice Over IP Communications Systems:** US Patent Application, Publication No. 2013-0329864A1 (Link to Emergency Assistance Calling for Voice Over IP Communications Systems); A notice of allowance by the USPTO was mailed for this patent Application No. 13/968,217 on April 6, 2016. It is the first continuation to the parent Enhanced 911: ("Emergency Assistance calling for VoIP communications") Patent No. 8,537,805. The technology associated with this newly allowed patent strengthens the parent patent. The Enhanced 911 technology satisfies the major requirement for the emergency response system which is the ability to call back the person making an emergency call to 9-1-1 in the event of a dropped connection. Currently 70% of all emergency calls to 9-1-1 are made via mobile or VoIP telephones and that number continues to increase. The major challenge for emergency response personnel is the ability to trace the call from a 911 mobile or VoIP caller since wireless telephones are not linked to a fixed location or address.

<u>Expiration Dates for VoIP-Pal Active U.S. Patent Matters as of January 1, 2018</u>

| Filing Date/Nat'l Phase Entry Filing Date | Application/Patent Number | Title/Subject | Status | Expiration |
|---|---|---|---|---|
| 05/03/2010 | 8,422,507 | INTERCEPTING VOICE OVER IP COMMUNICATIONS AND OTHER DATA COMMUNICATIONS | Issued | 6/22/2028 |
| 15/04/2013 | 9,143,608 | INTERCEPTING VOICE OVER IP COMMUNICATIONS AND OTHER DATA COMMUNICATIONS | Issued | 11/29/2026 |
| 17/07/2015 | 14/802929 | INTERCEPTING VOICE OVER IP COMMUNICATIONS AND OTHER DATA COMMUNICATIONS | Pending | Pending |
| 01/03/2010 | 8,542,815 | PRODUCING ROUTING MESSAGES FOR VOICE OVER IP COMMUNICATIONS | Issued | 3/3/2030 |
| 13/08/2013 | 9,179,005 | PRODUCING ROUTING MESSAGES FOR VOICE OVER IP COMMUNICATIONS | Issued | 1/31/2027 |
| 17/09/2013 | 9,137,385 | DETERMINING A TIME TO PERMIT A COMMUNICATIONS SESSION TO BE CONDUCTED | Issued | 5/31/2027 |
| 17/09/2013 | 8,774,378 | ALLOCATING CHARGES FOR COMMUNICATIONS SERVICES | Issued | 11/2/2026 |
| 07/07/2014 | 14/325181 | ALLOCATING CHARGES FOR COMMUNICATIONS SERVICES | Pending | Pending |
| 14/09/2015 | 14/853705 | DETERMINING A TIME TO PERMIT A COMMUNICATIONS SESSION TO BE CONDUCTED | Pending | Pending |
| 07/10/2015 | 14/877570 | PRODUCING ROUTING MESSAGES FOR VOICE OVER IP COMMUNICATIONS | Pending | Pending |
| 05/03/2010 | 8,537,805 | EMERGENCY ASSISTANCE CALLING FOR VOICE OVER IP COMMUNICATIONS SYSTEMS | Issued | 12/27/2028 |
| 15/08/2013 | 13/968217 | EMERGENCY ASSISTANCE CALLING FOR VOICE OVER IP COMMUNICATIONS SYSTEMS | Pending | Pending |
| 27/01/2011 | 8,630,234 | MOBILE GATEWAY | Issued | 7/1/2029 |
| 24/09/2013 | 14/035806 | MOBILE GATEWAY | Pending | Pending |
| 16/03/2012 | 8,675,566 | UNINTERRUPTED TRANSMISSION OF INTERNET PROTOCOL TRANSMISSIONS DURING ENDPOINT | Issued | 4/3/2032 |

| | | CHANGES | | |
|---|---|---|---|---|
| 27/11/2013 | 9154417 | UNINTERRUPTED TRANSMISSION OF INTERNET PROTOCOL TRANSMISSIONS DURING ENDPOINT CHANGES | Issued | 9/17/2029 |
| 17/07/2015 | 14/802872 | UNINTERRUPTED TRANSMISSION OF INTERNET PROTOCOL TRANSMISSIONS DURING ENDPOINT CHANGES | Pending | Pending |

**Amount Spent on Research and Development**

For the two years ended September 30, 2017, the Company has incurred no research and development expenses.

**Employees**

We have one full time employee. The Company utilizes various consultants and contractors for other services.

**Emerging Growth Company Status**

We are an "emerging growth company" as that term is used in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act") and, as such, have elected to comply with certain reduced public company reporting requirements for future filings.

In April 2012, the Jumpstart Our Business Startups Act ("JOBS Act") was enacted into law. The JOBS Act provides, among other things:

- Exemptions for "emerging growth companies" from certain financial disclosure and governance requirements for up to five years and provides a new form of financing to small companies;

- Amendments to certain provisions of the federal securities laws to simplify the sale of securities and increase the threshold number of record holders required to trigger the reporting requirements of the Securities Exchange Act of 1934, as amended;

- Relaxation of the general solicitation and general advertising prohibition for Rule 506 offerings;

- Adoption of a new exemption for public offerings of securities in amounts not exceeding $50 million; and

- Exemption from registration by a non-reporting company of offers and sales of securities of up to $1,000,000 that comply with rules to be adopted by the SEC pursuant to Section 4(6) of the Securities Act and exemption of such sales from state law registration, documentation or offering requirements.

In general, under the JOBS Act a company is an "emerging growth company" if its initial public offering ("IPO") of common equity securities was effected after December 8, 2011 and the company had less than $1 billion of total annual gross revenues during its last completed fiscal year. We will retain "emerging growth company" status until the earliest of:

|       |                                                                                                                 |
|-------|-----------------------------------------------------------------------------------------------------------------|
| (i)   | the completion of the fiscal year in which the company has total annual gross revenues of $1 billion or more,    |
| (ii)  | the completion of the fiscal year of the fifth anniversary of the company's IPO;                                |
| (iii) | the company's issuance of more than $1 billion in nonconvertible debt in the prior three-year period, or         |
| (iv)  | the company becoming a "larger accelerated filer" as defined under the Securities Exchange Act of 1934, as amended. |

The JOBS Act provides additional new guidelines and exemptions for non-reporting companies and for non-public offerings. Those exemptions that impact the Company are discussed below.

*Financial Disclosure.* The financial disclosure in a registration statement filed by an "emerging growth company" pursuant to the Securities Act of 1933, as amended, will differ from registration statements filed by other companies as follows:

(i)  audited financial statements required for only two fiscal years (provided that "smaller reporting companies" such as the Company are only required to provide two years of financial statements);

(ii)  selected financial data required for only the fiscal years that were audited (provided that "smaller reporting companies" such as the Company are not required to provide selected financial data as required by Item 301 of Regulation S-K); and

(iii)  executive compensation only needs to be presented in the limited format now required for "smaller reporting companies."

However, the requirements for financial disclosure provided by Regulation S-K promulgated by the Rules and Regulations of the SEC already provide certain of these exemptions for smaller reporting companies. The Company is a smaller reporting company. Currently a smaller reporting company is not required to file as part of its registration statement selected financial data and only needs to include audited financial statements for its two most current fiscal years with no required tabular disclosure of contractual obligations.

The JOBS Act also exempts the Company's independent registered public accounting firm from having to comply with any rules adopted by the Public Company Accounting Oversight Board ("PCAOB") after the date of the JOBS Act's enactment, except as otherwise required by SEC rule.

The JOBS Act further exempts an "emerging growth company" from any requirement adopted by the PCAOB for mandatory rotation of the Company's accounting firm or for a supplemental auditor report about the audit.

*Internal Control Attestation.* The JOBS Act also provides an exemption from the requirement of the Company's independent registered public accounting firm to file a report on the Company's internal control over financial reporting, although management of the Company is still required to file its report on the adequacy of the Company's internal control over financial reporting. Section 102(a) of the JOBS Act exempts "emerging growth companies" from the requirements in §14A(e) of the Securities Exchange Act of 1934 for companies with a class of securities registered under the Securities Exchange Act of 1934, as amended, to hold shareholder votes for executive compensation and golden parachutes.

*Other Items of the JOBS Act.* The JOBS Act also provides that an "emerging growth company" can communicate with potential investors that are qualified institutional buyers or institutions that are accredited to determine interest in a contemplated offering either prior to or after the date of filing the respective registration statement. The JOBS Act also permits research reports by a broker or dealer about an "emerging growth company" regardless of whether such report provides sufficient information for an investment decision. In addition, the JOBS Act precludes the SEC and FINRA from adopting certain restrictive rules or regulations regarding brokers, dealers and potential investors, communications with management and distribution of research reports on the "emerging growth company's" IPOs.

Section 106 of the JOBS Act permits "emerging growth companies" to submit registration statements under the Securities Act of 1933, as amended, on a confidential basis provided that the registration statement and all amendments thereto are publicly filed at least 21 days before the issuer conducts any road show. This is intended to allow "emerging growth companies" to explore the IPO option without disclosing to the market the fact that it is seeking to go public or disclosing the information contained in its registration statement until the company is ready to conduct a roadshow.

*Election to Opt Out of Transition Period.* Section 102(b)(1) of the JOBS Act exempts "emerging growth companies" from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act of 1933, as amended, registration statement declared effective or do not have a class of securities registered under the Securities Exchange Act of 1934, as amended) are required to comply with the new or revised financial accounting standard.

The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of the transition period. This may make comparison of the Company's financial statements with any other public company which is not either an "emerging growth company" nor an "emerging growth company" which has opted out of using the extended transition period difficult or impossible as possible different or revised standards may be used.

For so long as we remain an "emerging growth company" as defined in the JOBS Act, we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" as described above. We cannot predict if investors will find our common stock less attractive because we will rely on some or all of these

exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile. If we avail ourselves of certain exemptions from various reporting requirements, as is currently our plan, our reduced disclosure may make it more difficult for investors and securities analysts to evaluate us and may result in less investor confidence.

**Item 1A.        Risk Factors.**

The company qualifies as a smaller reporting company and is not required to provide the information required by this Item.

**Item 2.          Properties.**

The Company does not lease any properties or facilities, other than the office space leased for administrative purposes through Regus Management Group LLC.

**Item 3.          Legal Proceedings.**

The Company is party to the following legal proceedings:

i.    Locksmith Financial Corporation, Inc. et al. v Voip-Pal.com Inc. (Case No A-15-717491-C) filed in Clark County District Court (the "State Case"). On March 24, 2014, the Company resolved to freeze 95,832,000 common shares that were issued to a company controlled by a former director (the "defendant") in fiscal 2013 and accounted for at a cost of $1,443,000. The Company resolved to freeze the common shares as the Company believes that the shares were issued as settlement of a line of credit that the Company believes to have been legally unsupported. The defendant alleges that the freeze and the Company's actions constituted fraud and a breach of securities laws. The Company denies any wrongdoing. Currently the State Case is entering the discovery phase of litigation and the outcome is undeterminable.

ii.   Voip-Pal.com Inc. v Richard Kipping, et al. (Case No. 2:15-cv-01258-JAD-VCF) filed in United States District Court (the "Federal Case"). On July 2, 2015, the Company filed a case against a former director, a shareholder and the company controlled by a former director. The Company alleges that the common shares issued in the State Case and an additional 7,200,000 common shares were fraudulently obtained and that the shares have been unlawfully transferred to other entities. The proceedings in the Federal Case have been stayed pending a final determination of the issues in the State Case. The outcome of the case is undeterminable.

iii.  Voip-Pal.com Inc. v Apple, Inc. (Case No. 2:16-CV-00260) & Verizon Wireless Services, LLC, Verizon Communications Inc., AT&T Corp. (Case No. 2:16- VC-00271) in the United States District Court, District of Nevada. In February, 2016 the Company filed patent infringement lawsuits in the United States District Court, District of Nevada against Apple, Inc, (Case No. 2:16-CV-00260), Verizon Wireless Services, LLC, Verizon Communications Inc., and AT&T Corp. (Case No. 2:16- VC-00271). These cases are seeking a combined $7,024,377,876 in damages. On May 9, 2016, the lawsuits were officially served to these companies. The outcome of the cases is undeterminable. The proceedings in these cases are currently stayed, by agreement with the parties thereto, pending the resolution of several *Inter Partes* Reviews ("IPR"), as described in the following section *Inter Partes Reviews*.

iv.   Voip-Pal.com Inc. v Twitter, Inc. (Case No. 2:16-CV-02338) in the United States District Court, District of Nevada. Subsequent to the year ended September 30, 2016, on October 6, 2016, the Company filed a lawsuit in the United States District Court, District of Nevada against Twitter, Inc, (Case No. 2:16- CV-02338) in which Voip-Pal.com alleges infringement of U.S. Patent No. 8,542,815 and its continuation patent, U.S. Patent No. 9,179,005, This case is seeking $2,699,256,418 in damages. On December 28, 2016, the lawsuit was officially served to Twitter, Inc. It is anticipated that this case will also be stayed pending the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office's ("USPTO") issuance of final written decisions in IPR proceedings concerning the patents-at-issue (see *Inter Partes Reviews* below). The outcome of each of the patent actions is undeterminable.

*Inter Partes Reviews*

In other legal actions related to Case No. 2:16-CV-00260 and Case No. 2:16- VC-00271 above, two of the Company's patents are currently subject to several *Inter Partes* Reviews ("IPR(s)") before the PTAB. An IPR allows the PTAB to consider the validity of issued patents. There are no damages awarded, but a portion or all of a patent instituted for IPR may be invalidated as a result of the review.

During the year ended September 30, 2017, eight IPRs were in process at the PTAB, filed against Patent No. 8,542,815 and No. 9,179,005, as follows:

–    Unified Patents Inc. (Petitioner) vs. Voip-Pal.com Inc. (Patent Owner) IPR2016-01082, reviewing Patent No. 8,542,815. On December 8, 2016, this petition was not instituted by the PTAB;

–    Apple, Inc. (Petitioner) vs. Voip-Pal.com Inc. (Patent Owner) IPR2016-01198, reviewing Patent No. 9,179,005 and Voip-Pal.com Inc. (Patent Owner) IPR2016-01201, reviewing Patent No. 8,542,815, both instituted for IPR on November 21, 2016;

–    AT&T Inc. (Petitioner) filed IPR2017-01382 against Voip-Pal's Patent No. 8,542,815, IPR2017-01383 against Voip-Pal's Patent

No. 9,179,005, and IPR2017-01384 against Voip-Pal's Patent No. 9,179,005. Each of these three petitions were instituted for IPR by the PTAB on May 8, 2017; and

– Apple Inc. (Petitioner) filed IPR2017-01399 against Voip-Pal's Patent No. 8,542,815, and IPR2017-01398 against Voip-Pal's Patent No. 9,179,005, which were also both instituted for IPR by the PTAB on May 8, 2017.

Subsequent to the year ended September 30, 2017, on November 21, 2017 the PTAB issued its findings on the seven active IPRs being adjudicated, denying all claims made by the Petitioners (Apple Inc, and AT&T Inc.) in all seven instituted IPRs.

9

PART II

**Item 5.** **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

Market

Our common stock is quoted on the OTCQB with the OTC Markets Group, Inc. under the symbol "VPLM". The OTCQB is an inter-dealer quotation and trading system where market makers apply to quote securities. Accordingly, the OTCQB is not considered a market, and there is, therefore, no public market for our Common Stock.

Holders

We had approximately 381 record holders of our common stock as of September 30, 2017 according to the books of our transfer agent. The number of our stockholders of record excludes any estimate by us of the number of beneficial owners of shares held in street name, the accuracy of which cannot be guaranteed.

Dividends

We have not declared a dividend on our common stock, and we do not anticipate the payment of dividends in the near future as we intend to reinvest our profits to grow our business. There are no restrictions in our articles of incorporation or bylaws that restrict us from declaring dividends. The Nevada Revised Statutes, however, does prohibit us from declaring dividends where, after giving effect to the distribution of the dividend:

- we would not be able to pay our debts as they become due in the usual course of business; or
- our total assets would be less than the sum of our total liabilities, plus the amount that would be needed to satisfy the rights of shareholders who have preferential rights superior to those receiving the distribution.

Securities Authorized for Issuance Under Equity Compensation Plans

In order to provide incentive to its directors, officers, management, employees, consultants and others who provide services to the Company or any subsidiary (the "Service Providers") to act in the best interests of the Company, and to retain such Service Providers, the Company has in place an incentive Stock Option Plan (the "Plan"). Under the Plan, the Company is authorized to issue up to 10% of its issued and outstanding share capital in options to purchase common shares of the Company. The maximum term of options granted under the Plan cannot exceed ten years, with vesting terms determined at the discretion of the Board of Directors.

During the year ended September 30, 2017, the Company granted options under the Plan to several of its consultants to purchase 11,850,000 common shares in the capital stock of the Company at exercise prices of $0.05 and $0.06 per common share for a period of five years from the date of grant. 11,350,000 of the options granted during the period are vested and exercisable as at September 30, 2017, with the balance to vest within one year of the date of grant.

As at September 30, 2017, the Company has 39,850,000 stock options outstanding at an average exercise price of $0.06 per share, with a remaining contractual life of an average of 4.01 years, of which 39,350,000 are vested and exercisable.

Recent Sales of Unregistered Securities

The transactions described in this section were exempt from securities registration as provided by Section 4(a)(2) of the Securities Act for transactions not involving a public offering.

*Securities Issued for Services Rendered*

During the year ended September 30, 2014, the Company issued 18,850,000 shares of common stock at prices between $0.07 and $0.12 per share to various individuals or entities for services rendered.

During the year ended September 30, 2015, the Company issued 7,126,868 shares of common stock at prices between $0.05 and $0.06 per share to various individuals or entities for services rendered.

During the year ended September 30, 2016, the Company issued 16,357,500 shares of common stock at prices between $0.03 and $0.05 per share to various individuals or entities for services rendered.

During the year ended September 30, 2017, the Company issued 12,084,167 shares of common stock at prices between $0.025 and $0.05 per common share for services valued at $331,901.

During the year ended September 30, 2017, 900,000 shares of common stock priced at $0.05 per share issued for services were cancelled.

10

*Securities Issued for Convertible Debt or in Settlement of Debt*

During the year ended September 30, 2014, the Company issued 120,473,667 shares of common stock at prices between $0.01 and $0.12 per share to various individuals or entities to settle $1,532,320 of convertible debt.

During the year ended September 30, 2015, the Company issued 26,030,930 shares of common stock at prices between $0.05 and $0.08 per share to various individuals or entities to settle $1,293,183 of convertible debt.

During the year ended September 30, 2016, the Company issued 8,873,333 shares of common stock priced between $0.03 and $0.05 per share to various individuals or entities to settle $326,000 of convertible debt.

During the year ended September 30, 2016, the Company issued 10,000,000 shares of common stock at $0.05 per share to a director of the Company in settlement of $500,000 of an account payable.

During the year ended September 30, 2017, the Company issued 1,400,000 shares of common stock at prices between $0.025 and $0.03 per common share to convert $32,500 of convertible debt.

*Securities Issued for Cash Proceeds*

During the year ended September 30, 2014, the Company issued 3,350,000 shares of common stock at $0.08 per share to various individuals or entities for cash proceeds of $268,000 from private placements.

During the year ended September 30, 2016, the Company issued 10,458,333 shares of common stock at $0.04 per share to various individuals or entities for cash proceeds of $381,000 from private placements.

During the year ended September 30, 2017, the Company issued 11,566,666 shares of common stock at prices between $0.02 and $0.03 per common share for cash proceeds of $340,000 from private placements.

During the year ended September 30, 2017, the Company issued 61,500,500 units of common stock at between $0.02 and $0.025 per unit for cash proceeds of $1,250,010. Each unit consists of one common share and one common share purchase warrant. Each common share purchase warrant allows the holder to purchase one common share for $0.04 or $0.05 for a period of twelve months from the date of issuance.

**Item 6.        Selected Financial Data.**

As a smaller reporting company, we are not required to provide the information required by this Item.

**Item 7.        Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following management's discussion and analysis (MD&A) should be read in conjunction with our audited consolidated financial statements for the year ended September 30, 2017 and notes thereto.

This MD&A for the year ending September 30, 2017 contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amending, and Section 21E of the Securities Exchange Act of 1934, as amending. Forward-looking statements may be identified by the use of forward-looking terminology, such as "may", "shall", "could", "expect", "estimate", "anticipate", "predict", "probable", "possible", "should", "continue", or similar terms, variations of those terms or the negative of those terms. The forward-looking statements specified in the following information have been compiled by our management on the basis of assumptions made by management and are considered by management to be reasonable. Our future operating results, however, are impossible to predict and no representation, guaranty, or warranty is to be inferred from those forward-looking statements.

The assumptions used for purposes of the forward-looking statements specified in the following information represent estimates of future events and are subject to uncertainty as to possible changes in economic, legislative, industry, and other circumstances. As a result, the identification and interpretation of data and other information and their use in developing and selecting assumptions from among reasonable alternatives require the exercise of judgment. To the extent that the assumed events do not occur, the outcome may vary substantially from anticipated or projected results, and, accordingly, no opinion is expressed on the achievability of those forward-looking statements. No assurance can be given that any of the assumptions relating to the forward-looking statements specified in the following information are accurate, and we assume no obligation to update any such forward-looking statements.

<u>Overview</u>

VOIP-PAL.com Inc. ("Voip-Pal", the "Company") was incorporated in the state of Nevada in September 1997 as All American Casting International, Inc. and changed its name to VOIP MDI.com in 2004 and subsequently to Voip-Pal.Com Inc. in 2006. Since March 2004, the Company has been in the development stage of becoming a VoIP re-seller, a provider of a proprietary transactional billing platform tailored to the points and air mile business, and a provider of anti-virus applications for smartphones. All business activities prior to March 2004 have been abandoned and written off to deficit.

In December 2013, the Company completed the acquisition of Digifonica (International) Limited, a private company based in Gibraltar, whose assets included several patents and technology developed for the Voice-over-Internet Protocol ("VoIP") market.

Voip-Pal is a technical leader in patent development for the broadband Voice-over-Internet Protocol ("VoIP") market with the ownership and continued development of a portfolio of leading-edge VoIP Patents as its primary products. The Company has spent several years testing and developing its patented technology, and is currently seeking to monetize the patents through a corporate transaction, an asset sale, or licensure of its products.

Voip-Pal's intellectual property value is derived from ten issued USPTO patents. Voip-Pal inventions described in these patents provide the means to integrate VoIP services with any of the legacy telecommunications systems to create a seamless service using either legacy telephone numbers or IP addresses, and enhance the performance and value of VoIP implementations worldwide.

VoIP has been and continues to be a green field for innovation that has spawned numerous inventions, greatly benefitting consumers large and small across the globe. VoIP is used in many places and by every modern telephony system vendor, network supplier, and retail and wholesale carrier.

<u>Liquidity and capital resources</u>

As of September 30, 2017, the Company had an accumulated deficit of $34,246,816 as compared to an accumulated deficit of 31,636,143 at September 30, 2016. As of September 30, 2017, the Company had a working capital deficit of $192,376 as compared to a working capital surplus of $ 49,028 at September 30, 2016. The decrease in the Company's working capital of $241,404 was primarily due to an decrease in cash on hand as of September 30, 2017.

Net cash used by operations for the years ending September 30, 2017 and 2016 was $1,731,468 and $1,244,762, respectively. The increase in net cash used for operations for the year ending September 30, 2017 as compared to the year ending September 30, 2016 was primarily due to a decrease in shares issued for services.

Net cash used in investing activities for the years ending September 30, 2017 and 2016 was $(Nil) and $114,398, respectively. The decrease in cash used in investing activities was due to increased expenditures on patents for the year ended September 30, 2016. Net cash provided in financing activities for the years ending September 30, 2017 and 2016 was $1,622,510 and $707,000, respectively. The increase in net cash provided by financing activities of $915,510 was primarily due to an increase in proceeds from private placement of common shares during the year ended September 30, 2017.

<u>*Liquidity*</u>

The Company primarily finances its operations from cash received through the exercise of convertible loans from investors and through the payment of stock-based compensation. The Company believes its resources are adequate to fund its operations for the next twelve months.

<u>Results of operations</u>

The Company's operating costs consist of expenses incurred to monetizing, selling and licensing its VoIP patents. Other operating costs include expenses for legal, accounting and other professional fees, financing costs, and other general and administrative expenses.

**Comparison of Years Ending September 30, 2017 and 2016**

| | Years ending September 30 | | Increase / | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | (Decrease) | Percent |
| Revenue | $ — | $ — | $ — | — |
| Cost of Revenue | — | — | — | — |
| Gross Margin | — | — | — | — |
| General and administrative expenses | (2,472,482) | (3,344,737) | (872,255) | -26% |
| Amortization of intangible assets | (138,191) | (129,368) | 8,823 | 7% |
| Net loss | $ (2,610,673) | $ (3,474,105) | $ (863,432) | -25% |

*Revenues, Cost of Revenues and Gross Margin*

The Company had no revenues, cost of revenues or gross margin for the years ending September 30, 2017 and 2016.

*General and Administrative Expenses*

General and administrative expenses for the year ending September 30, 2017 totaled $2,472,482 compared to $3,344,737 during the year ended September 30, 2016.  The decrease in general and administrative expenses of 872,255, or 26% less than the previous year, was primarily due to lower amounts of patent consulting fees, stock-based compensation, and officer and director fees being paid out in the current year as compared to the previous year.

*Amortization of Intangible Assets*

Amortization of intellectual VoIP communications patent properties for the year ending September 30, 2017 totaled $138,191 compared to $129,368 during the year ended September 30, 2016. The increase in amortization expenses of $8,823, or 7% over the previous year was due to the full amortization reached on Intellectual VoIP patent intangible assets during the current year.

The Company follows GAAP (FAS 142) and is amortizing its intangibles over the remaining patent life of twelve (12) years. The Company evaluates its intangible assets annually and determines if the fair market value is less than its historical cost. If the fair market value is less, then impairment expense is recorded on the Company's financial statements. The intangible assets on the financial statements of the Company relate primarily to the Company's acquisition of Digifonica (International) Limited.

*Interest Expense*

The Company had no interest costs for the years ending September 30, 2017 and 2016.

*Net Loss*

The Company reported a net loss of $2,610,673 for the year ended September 30, 2017 compared to a net loss of $3,474,105 for the year ended September 30, 2016.  The net loss decrease of $863,432, or 25% over the previous year was due primarily to a decrease in the amount of patent consulting fees, stock-based compensation and officer and director fees paid out during the year ended September 30, 2017.

Off-Balance Sheet Arrangements

In February 2016, the board of directors of the Company authorized the Company to provide a performance bonus of up to 3% of the capital stock of the Company by way of the issuance of Rule 144 restricted common shares from its treasury to a yet undetermined group of related and non-related parties upon the successful completion of a sale or major licensing transaction, defined as a bonusable event. In order to provide maximum flexibility to the Company with respect to determining what constitutes such a bonusable event, the level of Performance Bonus payable, and who may qualify to receive a pro-rata share of such a Performance Bonus, the Company authorized full discretion to the Board in making such determinations. Since the Performance Bonus is only available upon the sale or a major licensing event, this potential transaction would not have a material impact on the Company's financial position, revenues or expenses, results of operations, liquidity or capital expenditures.

Subsequent to the year ended September 30, 2017, on November 23, 2017, the board of directors authorized the increase of the Performance Bonus to up to 5% of the capital stock of the Company.

There are no other off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that are material to investors.

Impact of Inflation

We believe that inflation has not had a material impact on our results of operations for the year ending September 30, 2017. We cannot assure you that future inflation will not have an adverse impact on our operating results and financial condition.

**Item 7A.        Quantitative and Qualitative Disclosures About Market Risk.**

As a smaller reporting company we are not required to provide the information required by this Item.

13

**Item 8.**          **Financial Statements and Supplementary Data.**

**VOIP-PAL.COM INC.**

**CONSOLIDATED FINANCIAL STATEMENTS**

Fiscal Year ending September 30, 2017

**CONSOLIDATED BALANCE SHEETS**                                                    16

**CONSOLIDATED STATEMENTS OF LOSS AND COMPREHENSIVE LOSS**                          17

**CONSOLIDATED STATEMENTS OF CASH FLOWS**                                          18

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**                                19

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**                                 20


# DAVIDSON & COMPANY LLP ————— Chartered Professional Accountants —————

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Directors of
Voip-Pal.com Inc.

We have audited the accompanying consolidated financial statements of Voip-Pal.com Inc. (the "Company"), which comprise the consolidated balance sheets of Voip-Pal.com Inc. as of September 30, 2017 and 2016, and the related consolidated statements of loss and comprehensive loss, cash flows, and changes in stockholders' equity for the years ended September 30, 2017 and 2016. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Voip-Pal.com Inc. as of September 30, 2017 and 2016, and the results of its operations and its cash flows for the years ended September 30, 2017 and 2016 in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming that Voip-Pal.com Inc. will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Voip-Pal.com Inc. has suffered recurring losses from operations and has a net capital deficiency. These matters, along with the other matters set forth in Note 1, indicate the existence of material uncertainties that raises substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**"DAVIDSON & COMPANY LLP"**

Vancouver, Canada                                        Chartered Professional Accountants

January 10, 2018



1200 - 609 Granville Street, P.O. Box 10372, Pacific Centre, Vancouver, B.C., Canada V7Y 1G6
Telephone (604) 687-0947 Davidson-co.com

**VOIP-PAL.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
**As at**
(Expressed in U.S. Dollars)

|  | | September 30, 2017 | | September 30, 2016 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| CURRENT | | | | |
| Cash | $ | 12,157 | $ | 121,115 |
| Prepaid expense | | 12,000 | | 71,250 |
| Legal retainer | | 100,000 | | 100,000 |
| | | 124,157 | | 292,365 |
| NON-CURRENT | | | | |
| Intellectual VoIP communications patent properties, net (Note 5) | | 1,055,750 | | 1,193,941 |
| TOTAL ASSETS | $ | 1,179,907 | $ | 1,486,306 |
| **LIABILITIES** | | | | |
| CURRENT | | | | |
| Accounts payable and accrued liabilities | $ | 316,533 | $ | 243,337 |
| TOTAL LIABILITIES | | 316,533 | | 243,337 |
| **STOCKHOLDERS' EQUITY** | | | | |
| SHARE CAPITAL (Note 9) | | 1,018,760 | | 933,108 |
| ADDITIONAL PAID-IN CAPITAL (Note 9) | | 33,028,389 | | 30,882,963 |
| SHARES TO BE ISSUED (Note 9) | | 1,063,041 | | 1,063,041 |
| DEFICIT | | (34,246,816) | | (31,636,143) |
| | | 863,374 | | 1,242,969 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 1,179,907 | $ | 1,486,306 |

Nature and Continuance of Operations (Note 1)
Contingent Liabilities (Note 13)

*The accompanying notes are an integral part of these consolidated financial statements*

**VOIP-PAL.COM INC.**
**CONSOLIDATED STATEMENTS OF LOSS AND COMPREHENSIVE LOSS**
**For the Fiscal Years ending**
(Expressed in U.S. Dollars)

| | | September 30, 2017 | | September 30, 2016 |
|---|---|---|---|---|
| EXPENSES | | | | |
| | | | | |
| Amortization (Note 5) | $ | 138,191 | $ | 129,368 |
| Officers and Directors fees (Note 6) | | 214,400 | | 713,000 |
| Legal fees (Note 6) | | 911,003 | | 201,065 |
| Office & general | | 291,988 | | 187,424 |
| Patent consulting fees | | 227,390 | | 853,060 |
| Professional fees & services (Note 6) | | 405,834 | | 439,894 |
| Stock-based compensation (Note 10) | | 421,867 | | 950,294 |
| | | | | |
| Total expenses | | 2,610,673 | | 3,474,105 |
| | | | | |
| NET LOSS AND COMPREHENSIVE LOSS FOR THE YEAR | $ | (2,610,673) | $ | (3,474,105) |
| Basic and diluted loss per common share | $ | (0.00) | $ | (0.00) |
| | | | | |
| Weighted-average number of common shares outstanding: | | | | |
| | | | | |
| Basic and diluted | | 1,111,696,541 | | 1,041,024,918 |

*The accompanying notes are an integral part of these consolidated financial statements*

17

**VOIP-PAL.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**For the Fiscal Years**
(Expressed in U.S. Dollars)

| | September 30, 2017 | September 30, 2016 |
|---|---|---|
| Cash Flows from Operating Activities | | |
| Net loss for the year | $    (2,610,673) | $    (3,474,105) |
| Add items not affecting cash: | | |
| Stock-based compensation | 421,867 | 950,294 |
| Shares issued for services | 231,701 | 1,121,195 |
| Amortization | 138,191 | 129,368 |
| | | |
| Changes in non-cash working capital: | | |
| Legal retainer | — | (100,000) |
| Accounts payable and accrued liabilities | 73,196 | 199,736 |
| Prepaid expense | 14,250 | (71,250) |
| Cash Flows Used in Operations | (1,731,468) | (1,244,762) |
| | | |
| Cash Flows from Investing Activities | | |
| Investment in VoIP patents | — | (114,398) |
| Cash Flows Used in Investing Activities | — | (114,398) |
| | | |
| Cash Flows from Financing Activities | | |
| Proceeds from convertible debentures | 32,500 | 326,000 |
| Proceeds from private placement | 1,590,010 | 381,000 |
| Cash Flows Provided by Financing Activities | 1,622,510 | 707,000 |
| | | |
| Decrease in cash | (108,958) | (652,160) |
| | | |
| Cash, beginning of the year | 121,115 | 773,275 |
| | | |
| Cash, end of the year | $       12,157 | $      121,115 |

Supplemental cash flow information – Note 7

*The accompanying notes are an integral part of these consolidated financial statements*

18

**VOIP-PAL.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Expressed in U.S. dollars)

| | Common Shares | | Shares to be Issued | Additional Paid-in Capital | Deficit | Total |
|---|---|---|---|---|---|---|
| | Number | Par Value | Value | | | |
| **Balance at September 30, 2015** | 1,019,658,368 | $ 896,292 | $ 846,721 | $28,357,610 | $(28,162,038) | $ 1,938,585 |
| | | | | | | |
| Shares issued in a private placement | 10,458,333 | 10,458 | — | 370,542 | — | 381,000 |
| Shares issued as share issuance costs | 1,126,667 | 1,127 | — | (1,127) | — | — |
| Shares issued for debt conversion | 8,873,333 | 8,873 | (87,000) | 404,127 | — | 326,000 |
| Shares issued for services | 16,357,500 | 16,358 | 303,320 | 801,517 | — | 1,121,195 |
| Shares to be issued for Anti-Dilution Clause (Notes 4 & 9) | — | — | — | — | — | — |
| Share purchase options granted | — | — | — | 950,294 | — | 950,294 |
| Net loss for the year | — | — | — | — | (3,474,105) | (3,474,105) |
| | | | | | | |
| **Balance at September 30, 2016** | 1,056,474,201 | 933,108 | 1,063,041 | 30,882,963 | (31,636,143) | 1,242,969 |
| | | | | | | |
| Shares issued in a private placement | 73,067,166 | 73,067 | — | 1,516,943 | — | 1,590,010 |
| Shares issued as share issuance costs | 4,336,667 | 4,337 | — | (4,337) | — | — |
| Shares issued for debt conversion | 1,400,000 | 1,400 | — | 31,100 | — | 32,500 |
| Shares issued for services | 7,747,500 | 7,748 | — | 223,953 | — | 231,701 |
| Shares cancelled on termination of services | (900,000) | (900) | — | (44,100) | — | (45,000) |
| Shares to be issued for Anti-Dilution Clause (Notes 4 & 9) | — | — | — | — | — | — |
| Share purchase options granted | — | — | — | 421,867 | — | 421,867 |
| Net loss for the year | — | — | — | — | (2,610,673) | (2,610,673) |
| | | | | | | |
| **Balance at September 30, 2017** | 1,142,125,534 | $ 1,018,760 | $ 1,063,041 | $33,028,389 | $(34,246,816) | $ 863,374 |

*The accompanying notes are an integral part of these consolidated financial statements*

19

## NOTE 1. NATURE AND CONTINUANCE OF OPERATIONS

VOIP-PAL.com, Inc. (the "Company") was incorporated in the state of Nevada in September, 1997 as All American Casting International, Inc. The Company's registered office is located at 10900 NE 4th Street, Suite 2300, Bellevue, Washington in the United States of America.

Since March 2004, the Company has been developing technology and patents related to Voice-over-Internet Protocol (VoIP) processes. All business activities prior to March 2004 have been abandoned and written off to deficit.

In December 2013, the Company completed the acquisition of Digifonica (International) Limited, a private company based in Gibraltar, whose assets included several patents and technology developed for the VoIP market.

These consolidated financial statements have been prepared on the basis of a going concern, which contemplates the realization of assets and discharge of liabilities in the normal course of business. The Company is in various stages of product development and continues to incur losses and, at September 30, 2017, had an accumulated deficit of $34,246,816 (September 30, 2016 - $31,636,143). The ability of the Company to continue operations as a going concern is dependent upon raising additional working capital, settling outstanding debts and generating profitable operations. These material uncertainties raise substantial doubt about the Company's ability to continue as a going concern. Should the going concern assumption not continue to be appropriate, further adjustments to carrying values of assets and liabilities may be required. There can be no assurance that capital will be available as necessary to meet these continued developments and operating costs or, if the capital is available, that it will be on the terms acceptable to the Company. The issuances of additional stock by the Company may result in a significant dilution in the equity interests of its current shareholders. Obtaining commercial loans, assuming those loans would be available, will increase the Company's liabilities and future cash commitments. If the Company is unable to obtain financing in the amounts and on terms deemed acceptable, its business and future success may be adversely affected.

Additionally, as the Company's stated objective is to monetize its patent suite through the licensing or sale of its intellectual property ("IP"), the Company being forced to litigate or to defend its IP claims through litigation casts substantial doubt on its future to continue as a going concern. IP litigation is generally a costly process, and in the absence of revenue the Company must raise capital to continue its own defense and to validate its claims – in the event of a failure to defend its patent claims, either because of lack of funding, a court ruling against the Company or because of a protracted litigation process, there can be no assurance that the Company will be able to raise additional capital to pay for an appeals process or a lengthy trial. The outcome of any litigation process may have a significant adverse effect on the Company's ability to continue as a going concern.

## NOTE 2. BASIS OF PRESENTATION

The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP").

## NOTE 3. SIGNIFICANT ACCOUNTING POLICIES

### Principles of Consolidation

These consolidated financial statements have been prepared on a consolidated basis and include the accounts of the Company and its wholly owned subsidiary Digifonica. All intercompany transactions and balances have been eliminated. As at September 30, 2017, Digifonica had no activities.

### Use of Estimates

The preparation of these consolidated financial statements required management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from these estimates. Where estimates have been used financial results as determined by actual events could differ from those estimates.

### Cash

Cash consists of cash on hand and monies held in checking and savings accounts. The Company had $12,157 and $121,115 in cash on September 30, 2017 and September 30, 2016, respectively.

20

**NOTE 3.        SIGNIFICANT ACCOUNTING POLICIES (CONT'D)**

**Intangible Assets**

Intangible assets, consisting of Intellectual VoIP communication patent properties are recorded at cost and amortized over the assets estimated life on a straight-line basis. Costs to renew or extend patents are capitalized. Management considers factors such as remaining life of the patents, technological usefulness and other factors in estimating the life of the assets.

The carrying value of intangible assets are reviewed for impairment by management of the Company at least annually or upon the occurrence of an event which may indicate that the carrying amount may be less than its fair value. If impaired, the Company will write-down such impairment. In addition, the useful life of the intangible assets will be evaluated by management at least annually or upon the occurrence of an event which may indicate that the useful life may have changed.

**Fair Value of Financial Instruments**

FASB ASC 820, Fair Value Measurement, defines fair value as the price that would be received upon sale of an asset or paid upon transfer of a liability in an orderly transaction between market participants at the measurement date and in the principal or most advantageous market for that asset or liability. The fair value should be calculated based on assumptions that market participants would use in pricing the asset or liability, not on assumptions specific to the entity.

The Company classifies financial assets and liabilities as held-for-trading, available-for-sale, held-to-maturity, loans and receivables or other financial liabilities depending on their nature. Financial assets and financial liabilities are recognized at fair value on their initial recognition, except for those arising from certain related party transactions which are accounted for at the transferor's carrying amount or exchange amount.

Financial assets and liabilities classified as held-for-trading are measured at fair value, with gains and losses recognized in net income. Financial assets classified as held-to-maturity, loans and receivables, and financial liabilities other than those classified as held-for-trading are measured at amortized cost, using the effective interest method of amortization. Financial assets classified as available-for-sale are measured at fair value, with unrealized gains and losses being recognized as other comprehensive income until realized, or if an unrealized loss is considered other than temporary, the unrealized loss is recorded in income.

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the amount that would be received for an asset or paid to transfer a liability (i.e., an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

Level 1: Quoted prices in active markets for identical assets and liabilities.

Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The fair value of cash is classified as Level 1 at September 30, 2017 and September 30, 2016.

The Company classifies its financial instruments as follows: Cash is classified as held for trading, and is measured at fair value. Accounts payable and accrued expenses are classified as other financial liabilities, and have a fair value approximating their carrying value, due to their short-term nature.

**Income Taxes**

Deferred income taxes have been provided for temporary differences between financial statement and income tax reporting under the asset and liability method, using expected tax rates and laws that are expected to be in effect when the differences are expected to reverse. A valuation allowance is provided when realization is not considered more likely than not.

The Company's policy is to classify income tax assessments, if any, for interest expense and for penalties in general and administrative expenses. The Company's income tax returns are subject to examination by the IRS and corresponding states, generally for three years after they are filed.

21

**NOTE 3.**     **SIGNIFICANT ACCOUNTING POLICIES (CONT'D)**

**Loss per Common Share**

Basic loss per share is calculated using the weighted-average number of common shares outstanding during each period. Diluted income per share includes potentially dilutive securities such as outstanding options and warrants outstanding during each period. To calculate diluted loss per share the Company uses the treasury stock method and the If-converted method.

For the period ended September 30, 2017 and the year ended September 30, 2016 there were no potentially dilutive securities included in the calculation of weighted-average common shares outstanding.

**Derivatives**

We account for derivatives pursuant to ASC 815, *Accounting for Derivative Instruments and Hedging Activities*. All derivative instruments are recognized in the consolidated financial statements and measured at fair value regardless of the purpose or intent for holding them. We determine fair value of warrants and other option type instruments based on option pricing models. The changes in fair value of these instruments are recorded in income or expense.

**Stock-based compensation**

The Company recognizes compensation expense for all stock-based payments made to employees, directors and others based on the estimated fair values of its common stock on the date of issuance.

The Company determines the fair value of the share-based compensation payments granted as either the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable. If the fair value of the equity instruments issued is used, it is measured using the stock price and other measurement assumptions as of the earlier of either the date at which a commitment for performance to earn the equity instrument is reached or the date the performance is complete.

The Company recognizes compensation expense for stock awards with service conditions on a straight-line basis over the requisite service period, which is included in operations. Stock option expense is recognized over the option's vesting period.

**Concentrations of Credit Risk**

The Company maintains cash at financial institutions, which at times, may be in excess of insured limits. The Company has not experienced any losses to date as a result of this policy and, in assessing its risk, the Company's policy is to maintain cash only with reputable financial institutions.  As of September 30, 2017, the Company's bank operating account balances were less than the Federal Deposit Insurance Corporation Insurance Limit of $250,000.

**Recent Accounting Pronouncements**

In November 2015, the FASB issued ASU 2015-17, Balance Sheet Classification of Deferred Taxes ("ASU 2015-17"). ASU 2015-17 requires companies to classify all deferred tax assets or liabilities as noncurrent on the balance sheet rather than separately disclosing deferred taxes as current and noncurrent. This standard is effective for the Company beginning on October 1, 2017 and can be applied either prospectively or retrospectively to all periods presented upon adoption. The standard did not have any impact on the Company's financial statements.

In January 2016, FASB issued ASU 2016-01 to amend certain aspects of recognition, measurement, presentation, and disclosure of financial instruments. Most prominent among the amendments is the requirement for changes in fair value of equity investments, with certain exceptions, to be recognized through profit or loss rather than other comprehensive income. The new standard will be effective for the Company beginning October 1, 2018. The standard is not expected to have any impact on the Company's financial statements.

In February 2016 FASB issued ASU No. 2016-02, Leases (Topic 842) which supersedes FASB ASC Topic 840, Leases (Topic 840) and provides principles for the recognition, measurement, presentation, and disclosure of leases for both lessees and the lessors. The new standard requires the lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. The classification will determine whether lease expense is recognized based on an effective interest method or on a straight-line basis over the term of the lease, respectively. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than twelve months regardless of classification. Leases with a term of twelve months or less will be accounted for similar to existing guidance for operating leases. The

standard is effective for annual and interim periods beginning after December 15, 2018, with early adoption permitted upon issuance. When adopted, the Company does not expect this guidance to have a material impact on its consolidated financial statements.

## NOTE 3.          SIGNIFICANT ACCOUNTING POLICIES (CONT'D)

**Recent Accounting Pronouncements (Cont'd)**

In March 2016, the FASB issued ASU 2016-09, Compensation-Stock Compensation (Topic 718), Improvements to Employee Share-Based Payment Accounting. Under ASU 2016-09, companies will no longer record excess tax benefits and certain tax deficiencies in additional paid in capital ("APIC"). Instead, they will record all excess tax benefits and tax deficiencies as income tax expense or benefit in the income statement and the APIC pools will be eliminated. In addition, ASU 2016-09 eliminates the requirement that excess tax benefits be realized before companies can recognize them. ASU 2016-09 also requires companies to present excess tax benefits as an operating activity on the statement of cash flows rather than as a financing activity. Furthermore, ASU 2016-09 will increase the amount an employer can withhold to cover income taxes on awards and still qualify for the exception to liability classification for shares used to satisfy the employer's statutory income tax withholding obligation. An employer with a statutory income tax withholding obligation will now be allowed to withhold shares with the fair value up to the amount of taxes owed using the maximum statutory rate in the employee's applicable jurisdiction(s). ASU 2016-09 requires a company to classify the cash paid to a tax authority when shares are withheld to satisfy its statutory income tax withholding obligation as a financing activity on the statement of cash flows. Under current U.S. GAAP, it is not specified how these cash flows should be classified. In addition, companies will now have to elect whether to account for forfeitures on share-based payments by (1) recognizing forfeiture awards as they occur or (2) estimating the number of awards expected to be forfeited and adjusting the estimate when it is likely to change, as in currently required. The amendments of this ASU are effective for reporting periods beginning after December 15, 2016, with early adoption permitted but all of the guidance must be adopted in the same period. The adoption of this ASU had no material impact on the Company's consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13 to replace the incurred loss impairment methodology in current U.S. GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss credit loss estimates. For trade and other receivables, loans and other financial instruments, the Company will be required to use a forward-looking expected loss model rather than the incurred loss model for recognizing credit losses which reflects losses that are probable. Credit losses relating to available for sale debt securities will also be recorded through an allowance for credit losses rather than as a reduction in the amortized cost basis of the securities. The new standard will be effective for the Company beginning October 1, 2020, with early adoption permitted. Application of the amendments is through a cumulative-effect adjustment to deficit as of the effective date. The Company is currently assessing the impact of the standard on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, "Statement of Cash Flows (Topic 230)". The new guidance is intended to reduce diversity in practice in how certain transactions are classified in the statement of cash flows. ASU No. 2016-15 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2017. Early adoption is permitted, provided that all of the amendments are adopted in the same period. The guidance requires application using a retrospective transition method. The Company is currently evaluating the impact of ASU No. 2016-15 on its financial position, results of operations and liquidity.

## NOTE 4.          PURCHASE OF DIGIFONICA

The Company acquired Digifonica in December 2013. Pursuant to the terms in the Share Purchase Agreement (the "SPA") the Company acquired 100% of Digifonica from the seller (the "Seller") for a cash payment of $800,000 and 389,023,561 common shares of the Company. The assets acquired through the acquisition were VoIP-related patented technology, including patents for Lawful Intercept, routing, billing and rating, mobile gateway, advanced interoperability solutions, intercepting voice over IP communications, and uninterrupted transmission of internet protocol transmissions during endpoint changes.

The SPA included an anti-dilution clause (the "Anti-Dilution Clause") that requires the Company to maintain the Seller's percentage ownership of the Company at 40% by issuing the Seller a proportionate number of common shares of any future issuance of the Company's common shares. Shares issued pursuant to the Anti-Dilution Clause are recorded as a share issuance cost within the Additional Paid-in Capital account (Notes 6 and 9).

## NOTE 5.          INTANGIBLE ASSETS

The Company acquired certain patents and technology from Digifonica in December 2013 (See Note 4). These assets have been recorded in the financial statements as intangible assets. These assets are being amortized over twelve (12) years on a straight-line basis. A summary of intangible assets as of September 30, 2017 and September 30, 2016 is as follows:

| | September 30, 2017 | | September 30, 2016 |
|---|---|---|---|
| VoIP Intellectual property and patents | $ | **1,552,416** | $ 1,552,416 |
| Accumulated amortization | | **(496,666)** | (358,475) |
| Net book value | $ | **1,055,750** | $ 1,193,941 |

There were no disposals of any intangible assets in the years presented.

**NOTE 6.**      **RELATED PARTY TRANSACTIONS**

The Company compensates certain of its key management personnel to operate its business in the normal course. Key management includes the Company's executive officers and members of its Board of Directors.

Compensation paid or accrued to key management during the year ended September 30, 2017 includes:

| | September 30, 2017 | | September 30, 2016 |
|---|---|---|---|
| Management fees to the CEO[1] | $ | 90,000 | $ | 590,000[1] |
| Management fees to the CFO | | 86,400 | | 60,000 |
| Management fees to the President | | 38,000 | | 24,000 |
| Directors fees | | Nil | | 39,000 |
| Fees to a director as legal counsel | | Nil | | 125,000 |
| Fees to a director for professional services | | 76,400 | | 73,068 |
| Stock-based compensation | | Nil | | 66,789 |
| | $ | 290,800 | $ | 977,857 |

[1] Of the $590,000 in CEO fees for the year ended September 30, 2016, $500,000 was paid through the issuance of 10,000,000 common shares (Note 9).

At September 30, 2017 included in accounts payable and accrued liabilities is $186,700 (2016 – $Nil) owed to current officers and directors. Amounts due to/from related parties are non-interest bearing, unsecured and have no fixed terms of repayment unless otherwise noted.

As at September 30, 2017, included in shares to be issued is $902,000 (September 30, 2016 - $902,000) for unpaid Officer and Director fees and $80,000 (September 30, 2016 - $80,000) for professional fees & services paid to a director for consulting services provided. Additionally, $994,548 (September 30, 2016 - $942,645) was accrued in the year to the Seller of Digifonica for the Anti-Dilution Clause (Notes 4 and 9).

**NOTE 7.**      **SUPPLEMENTAL CASH FLOW INFORMATION**

During the year ended September 30, 2017, the Company paid $nil (2016 - $nil) in interest or income taxes.

**NOTE 8.**      **CONVERTIBLE DEBENTURES**

The Company from time-to-time issues convertible debentures that are due on demand. The convertible debentures are convertible at fixed conversion rates and typically carry no interest. See Note 9 for details of common shares issued during the year from the conversion of convertible debentures.

**NOTE 9.**      **SHARE CAPITAL**

Capital Stock Authorized and Issued:

–1,300,000,000 common voting shares authorized with a par value of $0.001 each, of which 1,142,125,534 (2016 – 1,056,474,201) shares are issued.

–1,000,000 convertible preferred shares authorized with a par value of $0.01 each, of which nil (2016 – nil) shares are issued.

*Issues during the year ended September 30, 2017*

During the year ended September 30, 2017, the Company issued 73,067,166 common shares between $0.02 and $0.03 per common share for cash proceeds of $1,590,010 from private placements, as follows:

–11,566,666 common shares issued at between $0.02 and $0.03 per common share for cash proceeds of $340,000 from a private placement of common shares;

–61,500,500 units at between $0.02 and $0.025 per unit for cash proceeds of $1,250,010. Each unit consists of one common share and one common share purchase warrant. Each common share purchase warrant allows the holder to purchase one common share for $0.04 or $0.05 for a period of twelve months from the date of issuance; and

During the year ended September 30, 2017, the Company issued 4,336,667 common shares priced at $0.02 and $0.03 per common share as share issuance fees valued at $100,200.

During the year ended September 30, 2017, the Company issued 1,400,000 common shares priced between $0.025 and $0.03 per common share to convert $32,500 of convertible debentures.

**NOTE 9.**  **SHARE CAPITAL (CONT'D)**

During the year ended September 30, 2017, the Company issued 7,747,500 common shares priced between $0.025 and $0.05 per common share for services valued at $231,701.

During the year ended September 30, 2017, 900,000 common shares priced at $0.05 per common share were cancelled. The shares had been issued as an advance payment for the provision of services under a contract which was terminated prior to fulfillment.

*Issues during the year ended September 30, 2016*

During the year ended September 30, 2016, the Company issued 10,458,333 common shares at $0.04 per common share for cash proceeds of $381,000 from private placements.

During the year ended September 30, 2016, the Company issued 1,126,667 common shares priced between $0.03 - $0.04 per common share as consulting fees valued at $39,800.

During the year ended September 30, 2016, the Company issued 8,873,333 common shares priced between $0.03-$0.05 per common share to convert $326,000 of convertible debentures.

During the year ended September 30, 2016, the Company issued 16,357,500 common shares priced between $0.03-$0.05 per common share for services received valued at $1,121,195.

During the year ended September 30, 2016, the Company issued 10,000,000 common shares at $0.05 per common share to a director of the Company, which issuance is included in Officers and Directors fees (Note 6).

<u>Shares to be Issued</u>

As at September 30, 2017, there are 23,353,846 (September 30, 2016 – 23,353,846) common shares to be issued that are accrued for professional services provided to the Company valued at $1,058,320 (September 30, 2016 – $1,058,320), of which 21,281,903 (September 30, 2016 – 21,281,903) are accrued to management and related parties. As at September 30, 2017, $4,721 (September 30, 2016 – $4,721) was included in common shares to be issued for cash received in advance of common shares being issued.

As at September 30, 2017, there are 57,826,653 (September 30, 2016 - 23,566,119) common shares to be issued that are accrued to the seller of Digifonica pursuant to the Anti-Dilution Clause (see Notes 4 and 6), valued at $1,937,193 (September 30, 2016 - $942,645).

<u>Warrants</u>

During the year ended September 30, 2017, the Company issued 61,500,500 common share purchase warrants to purchase 61,500,500 common shares in the capital stock of the Company at a price of $0.04 or $0.05 per common share for a period of twelve months from date of issue in private placements of units. As at September 30, 2017, the Company has 61,500,500 (2016 – Nil) warrants outstanding to purchase 61,500,500 common shares at a weighted average price of $0.04 per common share expiring on dates ranging from February 2018 through September 2018. No warrants were issued or outstanding during the year ended September 30, 2016.

<u>Subsequent Issues</u>

Subsequent to the year ended September 30, 2017, the Company:

– conducted a private placement of units (common shares and common share purchase warrants) in its common stock, issuing 6,306,000 units at between $0.0125 and $0.02 per unit for cash proceeds of $98,120;

– conducted a private placement of shares in its common stock, issuing 78,731,663 common shares at between $0.015 and $0.06 per common share for cash proceeds of $1,824,475;

– issued 1,000,000 shares of its common stock at a price of $0.04 per common share on the exercise of common share purchase warrants for gross proceeds of $40,000;

– issued 158,000 shares of its common stock at a price of $0.015 per common share in payment of consulting services valued at $2,370; and

– issued 10,000,000 shares of its common stock at a price of $0.06 per common share in payment of consulting services valued at $600,000.

25

**NOTE 10.        STOCK-BASED COMPENSATION**

*Stock Option Plan*

In order to provide incentive to directors, officers, management, employees, consultants and others who provide services to the Company or any subsidiary (the "Service Providers") to act in the best interests of the Company, and to retain such Service Providers, the Company has in place an incentive Stock Option Plan (the "Plan") whereby the Company is authorized to issue up to 10% of its issued and outstanding share capital in options to purchase common shares of the Company. The maximum term of options granted under the Plan cannot exceed ten years, with vesting terms determined at the discretion of the Board of Directors.

During the year ended September 30, 2017, the Company granted options under the Plan to several of its consultants to purchase 11,850,000 common shares in the capital stock of the Company at exercise prices of $0.05 and $0.06 per common share for a period of five years from the date of grant. 11,350,000 of the options granted during the period are vested and exercisable as at September 30, 2017, with the balance to vest within one year of the date of grant.

The following table summarizes the Company's stock option transactions:

| | Number of options | | Weighted average exercise price |
|---|---|---|---|
| Balance September 30, 2015 | Nil | $ | N/A |
| Granted | 28,000,000 | | 0.06 |
| **Balance September 30, 2016** | **28,000,000** | **$** | **0.06** |
| Granted | 11,850,000 | | 0.05 |
| **Balance September 30, 2107** | **39,850,000** | **$** | **0.06** |

The following table summarizes the stock options outstanding at September 30, 2017:

| Options Outstanding | | Exercise Price | Remaining Contractual Life (Yrs) | Number of Options Currently Exercisable |
|---|---|---|---|---|
| 14,000,000 | $ | 0.06 | 3.73 | 14,000,000 |
| 14,000,000 | | 0.06 | 3.94 | 14,000,000 |
| 3,450,000 | | 0.06 | 4.07 | 2,950,000 |
| 8,400,000 | | 0.05 | 4.55 | 8,400,000 |
| **39,850,000** | **$** | **0.06** | **4.01** | **39,350,000** |

The following assumptions were used for the Black-Scholes valuation of stock options granted during the year ended September 30, 2017: risk-free rate of 1.25% (2016 – 1.25%), expected life of 5 years (2016 – 5 years), annualized historical volatility of 112.0% (2016 - 112.0%) and a dividend rate of 0% (2016 – 112%). Expected volatilities are based on historical volatility of the Company's stock and other factors. The compensation cost that has been charged against income from options vested under the Plan was $421,867 for the year ended September 30, 2017 (2016 - $950,294).

The weighted-average grant-date fair value of options granted during the year ended September 30, 2017 was $0.06 (2016 - $0.04). The total intrinsic value of options exercised during the year ended September 30, 2017 was $nil (2016 - $nil).

**NOTE 11.        INCOME TAXES**

The Company and its subsidiary file consolidated Federal and state income tax returns. The Company is registered in the State of Nevada which has no corporate income tax.

Certain tax years are subject to examination by the Internal Revenue Service and state taxing authorities. The Company does not believe there would be any material adjustments upon such examination.

As of September 30, 2017 and 2016, the Company had net operating loss carryforwards of approximately $24,857,000 and $20,446,000 respectively, to reduce Federal income tax liabilities through 2037.

**NOTE 11.        INCOME TAXES (CONT'D)**

A reconciliation of income taxes at statutory rates with the reported taxes is as follows:

|  | | 2017 | | 2016 |
|---|---|---|---|---|
| Loss for the year | $ | (2,610,673) | $ | (3,424,105) |
| Expected income tax (recovery) | $ | (659,000) | $ | (877,000) |
| Change in statutory, foreign tax, foreign exchange rates and other | | (1,030,000) | | (266,000) |
| Permanent Difference | | 143,000 | | 323,000 |
| Change in unrecognized deductible temporary differences | | 1,546,000 | | 820,000 |
| **Total income tax expense (recovery)** | $ | — | $ | — |

The significant components of the Company's temporary differences, unused tax credits and unused tax losses that have not been included on the consolidated statement of financial position are as follows:

|  | 2017 | Expiry Date Range | 2016 | Expiry Date Range |
|---|---|---|---|---|
| **Temporary Differences** | | | | |
| Intangible assets | $    25,356,000 | No expiry date | $    25,218,000 | No expiry date |
| Non-capital losses available for future period | $    24,857,000 | 2033 to 2037 | $    20,446,000 | 2033 to 2036 |

Tax attributes are subject to review, and potential adjustment, by tax authorities.

**NOTE 12.        SEGMENTED INFORMATION**

The Company operates in one reportable segment being the acquisition and development of VoIP-related intellectual property including patents and technology. All intangible assets are located in the United States of America.

**NOTE 13.        CONTINGENT LIABILITIES**

***Litigation***

The Company is party to pending litigation cases as follows:

i)    Locksmith Financial Corporation, Inc. et al. v Voip-Pal.com Inc. (Case No A-15-717491-C) filed in Clark County District Court (the "State Case")

On March 24, 2014, the Company resolved to freeze 95,832,000 common shares that were issued to a company controlled by a former director (the "defendant") in fiscal 2013 and accounted for at a cost of $1,443,000. The Company resolved to freeze the common shares as the Company believes that the shares were issued as settlement of a line of credit that the Company believes to have been legally unsupported. The defendant alleges that the freeze and the Company's actions constituted fraud and a breach of securities laws. The Company denies any wrongdoing. Currently the State Case is entering the discovery phase of litigation and the outcome is undeterminable.

ii)    Voip-Pal.com Inc. v Richard Kipping, et al. (Case No. 2:15-cv-01258-JAD-VCF) filed in United States District Court (the "Federal Case")

On July 2, 2015, the Company filed a case against a former director, a shareholder and the company controlled by a former director. The Company alleges that the common shares issued in the State Case and an additional 7,200,000 common shares were fraudulently obtained and that the shares have been unlawfully transferred to other entities. The proceedings in the Federal Case have been stayed pending a final determination of the issues in the State Case. The outcome of the case is undeterminable.

**NOTE 13.** **CONTINGENT LIABILITIES (CONT'D)**

*Litigation (Cont'd)*

iii) Voip-Pal.com Inc. v Apple, Inc. (Case No. 2:16-CV-00260) & Verizon Wireless Services, LLC, Verizon Communications Inc., AT&T Corp. (Case No. 2:16- VC-00271) in the United States District Court, District of Nevada

In February, 2016 the Company filed patent infringement lawsuits in the United States District Court, District of Nevada against Apple, Inc, (Case No. 2:16-CV-00260), Verizon Wireless Services, LLC, Verizon Communications Inc., and AT&T Corp. (Case No. 2:16- VC-00271). These cases are seeking a combined $7,024,377,876 in damages. On May 9, 2016, the lawsuits were officially served to these companies. The proceedings in these cases are currently stayed, by agreement with the parties thereto, pending the outcome of two *Inter Partes* Reviews ("IPRs"), as noted below. The outcome of each of these legal actions is undeterminable.

iv) Voip-Pal.com Inc. v Twitter, Inc. (Case No. 2:16-CV-02338) in the United States District Court, District of Nevada

During the year ended September 30, 2017, on October 6, 2016, the Company filed a lawsuit in the United States District Court, District of Nevada against Twitter, Inc, (Case No. 2:16- CV-02338) in which Voip-Pal.com alleges infringement of U.S. Patent No. 8,542,815 and its continuation patent, U.S. Patent No. 9,179,005, This case is seeking $2,699,256,418 in damages. On December 28, 2016, the lawsuit was officially served to Twitter, Inc. It is anticipated that this case will also be stayed pending the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office's ("USPTO") issuance of final written decisions in IPR proceedings concerning the patents-at-issue (see *Inter Partes Reviews* below). The outcome of this case is undeterminable.

*Inter Partes Reviews*

In additional legal actions related to Item iii above, two of the Company's patents are currently subject to several *Inter Partes* Reviews ("IPR(s)") before the PTAB. An IPR allows the PTAB to consider the validity of issued patents. There are no damages awarded, but a portion or all of a patent instituted for IPR may be invalidated as a result of the review.

During the year ended September 30, 2017, eight IPRs were in process at the PTAB, filed against Patent No. 8,542,815 and No. 9,179,005, as follows:

– Unified Patents Inc. (Petitioner) vs. Voip-Pal.com Inc. (Patent Owner) IPR2016-01082, reviewing Patent No. 8,542,815. On December 8, 2016, this petition was not instituted by the PTAB;

– Apple, Inc. (Petitioner) vs. Voip-Pal.com Inc. (Patent Owner) IPR2016-01198, reviewing Patent No. 9,179,005 and Voip-Pal.com Inc. (Patent Owner) IPR2016-01201, reviewing Patent No. 8,542,815, both instituted for IPR on November 21, 2016;

– AT&T Inc. (Petitioner) filed IPR2017-01382 against Voip-Pal's Patent No. 8,542,815, IPR2017-01383 against Voip-Pal's Patent No. 9,179,005, and IPR2017-01384 against Voip-Pal's Patent No. 9,179,005. Each of these three petitions were instituted for IPR by the PTAB on May 8, 2017; and

– Apple Inc. (Petitioner) filed IPR2017-01399 against Voip-Pal's Patent No. 8,542,815, and IPR2017-01398 against Voip-Pal's Patent No. 9,179,005, which were also both instituted for IPR by the PTAB on May 8, 2017.

Subsequent to the year ended September 30, 2017, on November 21, 2017 the PTAB issued its findings on the seven active IPRs being adjudicated, denying all claims made by the Petitioners (Apple Inc, and AT&T Inc.) in all seven instituted IPRs.

*Performance Bonus Payable*

During the year ended September 30, 2016, the board of directors authorized the Company to provide a performance bonus of up to 3% of the capital stock of the Company (the "Performance Bonus") by way of the issuance of Common shares from its treasury to an as yet undetermined group of related and non-related parties upon the successful completion of a purchase and sale of the Company or a major licensing transaction, defined as a bonusable event. In order to provide maximum flexibility to the Company with respect to determining what constitutes such a bonusable event, the level of Performance Bonus payable, and who may qualify to receive a pro-rata share of such a Performance Bonus, the Company authorized full discretion to the Board in making such determinations.

Subsequent to the year ended September 30, 2017, on November 23, 2017, the board of directors authorized the increase of the Performance Bonus to up to 5% of the capital stock of the Company.

As at September 30, 2017 and the date of this report, no bonusable event has occurred and there is as yet no Performance Bonus payable.

**Item 9.**     **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

There have been no changes in or disagreements with accountants on accounting or financial disclosure matters.

**Item 9A.**     **Controls and Procedures.**

Evaluation of Disclosure Controls and Procedures

Management conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of September 30, 2017. In making this assessment, management used the criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO. The COSO framework summarizes each of the components of a company's internal control system, including (i) the control environment, (ii) risk assessment, (iii) control activities, (iv) information and communication, and (v) monitoring. In management's assessment of the effectiveness of internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) as required by Exchange Act Rule 13a-15(c), our management concluded as of the end of the fiscal period covered by this Quarterly Report on Form 10-Q that our internal control over financial reporting has not been effective. The company intends, prior to the next fiscal year as the company's finances improve, to hire additional accounting staff and implement additional controls.

As defined by Auditing Standard No. 5, "An Audit of Internal Control Over Financial Reporting that is Integrated with an Audit of Financial Statements and Related Independence Rule and Conforming Amendments," established by the Public Company Accounting Oversight Board ("PCAOB"), a material weakness is a deficiency or combination of deficiencies that results more than a remote likelihood that a material misstatement of annual or interim financial statements will not be prevented or detected. In connection with the assessment described above, management identified the following control deficiencies that represent material weaknesses as of September 30, 2017:

1)  Lack of segregation of duties. Now, our resources and size prevent us from being able to employ sufficient resources to enable us to have adequate segregation of duties within our internal control system. Management will periodically reevaluate this situation.

2)  Lack of an independent audit committee. Although the Board of Directors serves an audit committee it is not comprised solely of independent directors. We may establish an audit committee comprised solely of independent directors when we have sufficient capital resources and working capital to attract qualified independent directors and to maintain such a committee.

3)  Insufficient number of independent directors. Now, our Board of Directors does not consist of a majority of independent directors, a factor that is counter to corporate governance practices as set forth by the rules of various stock exchanges.

Our management determined that these deficiencies constituted material weaknesses. Due to a lack of financial resources, we are not able to, and do not intend to, immediately take any action to remediate these material weaknesses. We will not be able to do so until we acquire sufficient financing to do so. We will implement further controls as circumstances, cash flow, and working capital permit. Notwithstanding the assessment that our ICFR was not effective and that there were material weaknesses as identified in this report, we believe that our financial statements fairly present our financial position, results of operations and cash flows for the years covered thereby in all material respects.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer, to allow timely decisions regarding required disclosure.

Limitations on the Effectiveness of Internal Controls

Our management does not expect that our disclosure controls and procedures or our internal control over financial reporting will necessarily prevent all fraud and material error. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving our objectives and our Chief Executive Officer concluded that our disclosure controls and procedures are effective at that reasonable assurance level. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because

of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the internal control. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, control may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate.

<u>Changes in Internal Control Over Financial Reporting</u>

There have been no changes in our internal controls over financial reporting during the year ended September 30, 2017 that have materially affected or are reasonably likely to materially affect such controls.

**Item 9B.**      **Other Information.**

Not Applicable.

## PART III

**Item 10.          Directors, Executive Officers and Corporate Governance.**

The following table sets forth the names and ages of our current directors and executive officers. Also the principal offices and positions with us held by each person and the date such person became our directors and executive officers. Our executive officers were appointed by our Board of Directors. Our directors serve until the earlier occurrence of the election of his or her successor at the next meeting of stockholders, death, resignation or removal by the Board of Directors. There are no family relationships among our directors and executive officers.

| Name | Age | Position | Date |
|------|-----|----------|------|
| **Dr. Colin Tucker** | 72 | Director and Chairman | 2013 |
| **Emil Malak** | 65 | Director and Chief Executive Officer | 2014 |
| **Dennis Chang** | 69 | Director and President | 2009 |
| **Professor Edwin Candy** | 73 | Independent Director | 2013 |
| **Dr. Ryan L. Thomas** | 63 | Director | 2015 |
| **D. Barry Lee** | 61 | Chief Financial Officer | 2015 |

Set forth below is a brief description of the background and business experience of each executive officer and director for the past five years:

**Dr. Colin Tucker** was a founding member of Orange plc, a company he helped grow into a mobile network leader, generating billions in annual revenues and operating in six countries. Orange was sold to France Telecom for £25 billion (approximately $38 billion USD). Dr. Tucker has served as a Director and CEO of Hutchison 3G where in 2003, he oversaw the deployment of the first 3G mobile network in the UK. Under his leadership Hutchison later became one of the first mobile phone operators in the world to embrace VoIP, and offer mobile applications such as Skype, Facebook and eBay. Dr. Tucker has served on the boards of many companies over his distinguished career and was listed as one of the 8 key people to know in the Telecommunications sector by Financial Times.

**Emil Malak** was the co-founder of Digifonica in 2003 and oversaw the development of the patents acquired by Voip-Pal in 2013. Mr. Malak also serves as Chairman of the Board for a biotech company currently conducting cancer research in Germany.

**Dennis Chang** has been the President of Voip-Pal.com Inc. since September 3, 2009. He was formerly a Sr. Business Management Consultant for Antares Corporation from January 2003 through November 2010.

**Professor Edwin Candy** was previously the Technology Director of Hutchison 3G until his retirement in 2009. At Hutchison, he was instrumental in the development of the most advanced 3G Networks operating across nine countries successfully introducing enterprise and I/P architectures into the cellular networks to provide mobile internet access. Prior to this he held Technology or Technical director positions in Orange, Hutchison Personal Communications, and Philips spin off companies in the UK and France as well as International Radio Systems Manager for Philips in the late 80's. During his career he established a number of major technology and research programs including, the EU UMTs 3G program with twenty five industrial partners that led to the creation of 3G mobile systems and the TETRA digital standard for public safety communications. He has held a number of key Industrial posts including Chairman of the UK Government DTI UMTS Technical Advisory Group, Chairman of the GSMA PCN group charged with the integration of DSC 1800 with the GSM standard, and Founder and Chairman of the UMTs Forum. He currently holds a number of Non Exec positions in small wireless companies as well as operating his own technology consultancy business. He is a Fellow of the IET, a Senior Life Member of the IEEE, a Companion of the IREE Australia. He was a visiting Professor at Strathclyde University Scotland and Member of the University Court from 1995 until 2005.

**Dr. Ryan L. Thomas** is a licensed attorney in Utah and California, and has been in private practice since 1981. He is also currently an Associate Provost and Dean of Undergraduate Studies, Weber State University. Dr. Ryan Thomas has served as in-house counsel for

the past two years. He has been practicing law since 1979 and has over 35 years of experience as a litigator. Dr. Thomas has a strong technological and computer science background and has extensive experience in patent law.

**D. Barry Lee** is the Founder and CEO of Equity One Capital Corporation, a financial management and consulting services company, and has served as such since 1999 to the present. He is also the Co-founder, Partner & CFO from 1991 to present of First Merit Group, a senior management and corporate financing company for private & public companies. He is a senior management consultant with 25 years of experience in all aspects of business, providing financial management, consulting and advisory services to private and public companies.

**Item 11.**     **Executive Compensation.**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards | Price per Share | Stock Awards ($) | Option Awards ($) | All Other Compensation | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **Dr. Colin Tucker** | 2017 | — | — | — | — | — | — | — | |
| *Chairman* | 2016 | $ 12,000 | — | — | — | — | — | — | $ 12,000 |
| **Emil Malak** | 2017 | $ 90,000 | — | — | — | — | — | — | $ 90,000 |
| *CEO & Director* | 2016 | $ 90,000 | — | — | — | — | — | — | $ 90,000 |
| **Dennis Chang** | 2017 | $ 38,000 | — | — | — | — | — | — | $ 38,000 |
| *President /* | | | | | | | | | |
| *Director* | 2016 | $ 24,000 | — | 500,000 | $ 0.05 | $ 15,000 | — | — | $ 39,000 |
| **Edwin Candy** | 2017 | — | — | — | — | — | — | — | |
| *Director* | 2016 | $ 12,000 | — | — | — | — | — | — | $ 12,000 |
| **Ryan L. Thomas** | 2016 | $ — | — | — | — | — | — | — | |
| *Director* | 2017 | $ — | — | 100,000 | $ 0.05 | $ 5,000 | — | $ 198,068 | $203,068 |
| **D. Barry Lee** | 2017 | $ 86,400 | — | — | — | — | — | — | $ 86,400 |
| *CFO* | 2016 | $ 60,000 | — | — | — | — | $ 66,789 | — | $126,789 |

**Item 12.**     **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The following table sets forth certain ownership information with respect to our common stock for those persons who directly or indirectly own, control or hold with the power to vote, five percent or more of our outstanding common stock and all officers and directors, as a group.

| Name and Address of Beneficial Owner | Amount of Direct Ownership | Amount of Indirect Ownership | Percent of Class |
|---|---|---|---|
| Dr. Colin Tucker<br>The Old House Back Lane<br>Oxhill, Warwickshire, CV350QN, UK | 6,000,000 | Nil | 0.48% |
| Emil Malak<br>Suite 41-42 Victoria House, 26 Main Street<br>Gibraltar, Gibraltar | Nil | 362,063,561 [1] | 29.24% |
| Dennis Chang<br>1120 South 25th Street, #95<br>Mount Vernon, WA 98274 | 16,326,520 | Nil | 1.32% |
| Professor Edwin Candy<br>Suite 41-42 Victoria House, 26 Main Street<br>Gibraltar, Gibraltar | Nil | 5,000,000 [2] | 0.40% |
| Dr. Ryan L. Thomas<br>2740 E 1700<br>N. Layton, UT 84040 | 1,217,064 | Nil | 0.10% |
| D. Barry Lee<br>Suite 283 - 1755 Robson Street<br>Vancouver, BC V6G 3B7 Canada | 2,000,000 | Nil | 0.16% |
| Talisman Financial, Inc.[3]<br>76 Dean St.<br>Belize City, Belize | 70,000,000 | Nil | 5.65% |

[1] These shares are held in the name of Digifonica Intellectual Properties (DIP) Limited in trust for Mr. Malak. Mr. Malak has sole voting power over Digifonica Intellectual Properties (DIP) Limited.

[2] These shares are held in the name of Digifonica Intellectual Properties (DIP) Limited, over which Mr. Malak has sole control, in trust for Mr. Candy.

[3] Justin West is the control person of Talisman Financial, Inc.

**Item 13.**  **Certain Relationships and Related Transactions.**

Related Party Transactions

During the year ended September 30, 2017 the Company paid or accrued $90,000 (2016 - $590,000) to the CEO, $86,400 (2016 - $60,000) to the CFO, $38,000 (2016 - $39,000) to the President, Chairman fees of $Nil (2016 - $12,000) and other Directors fees of $Nil (2016 - $27,000). During the year ended September 30, 2017, the Company paid or accrued $76,400 (2016 - $73,068) for professional fees and services and $Nil (2016 - $125,000) in legal fees paid or accrued to a Director in his capacity as legal counsel. The Company granted Nil (2016 - 2,000,000) stock options to its Directors and Officers, resulting in $Nil (2016 - $66,789) of stock-based compensation.

Included in Shares to be issued as at September 30, 2017 is $902,000 (2016 - $902,000) for unpaid Officer and Director fees and $80,000 (2016 - $80,000) for professional fees & services paid to a director for consulting services provided. Additionally, $994,548 (2016 - $942,645) is accrued to the Seller of Digifonica for the Anti-Dilution Clause.

Director Independence

We are not subject to the listing requirements of any national securities exchange or national securities association and, as a result, we are not at this time required to have our Board comprised of a majority of "independent directors." One of our five directors (see Item 6 above) is independent as defined under the Nasdaq Marketplace Rules.

**Item 14.**  **Principal Accounting Fees and Services.**

Audit Fees and Services

For the fiscal year ended September 30, 2017 professional services were performed by Davidson & Company LLP, Chartered Professional Accountants. The aggregate fees billed by Davidson & Company LLP, Chartered Professional Accountants for the fiscal year ended September 30, 2017 were as follows:

|  | 2016 to 2017 | |
|---|---|---|
| Audit Fees | $ | 36,720 |
| Audit-Related Fees | $ | 13,020 |
| Tax Fees | $ | Nil |
| All Other Fees | $ | Nil |

Audit Fees: Aggregate fees billed for professional services rendered for the audit of the Company's annual financial statements.

Audit Related Fees: Aggregate fees billed for professional services rendered for assurance and related services that were reasonably related to the performance of the audit or review of our financial statements and are not reported under "Audit Fees" above.

All services listed were pre-approved by the Board of Directors, functioning as the Audit Committee in accordance with Section 2(a) 3 of the Sarbanes-Oxley Act of 2002.

The Board has considered whether the services described above are compatible with maintaining the independent accountant's independence and has determined that such services have not adversely affected Davidson & Company LLP's independence.

**Item 15.**  **Financial Statements and Exhibits.**

(a) Financial Statements. Our financial statements begin on page 14 of this registration statement.

(b) Exhibits. The following are furnished as exhibit hereto:

| Exhibit No. | Description of Exhibits |
|---|---|
| 3.1 | Articles of Incorporation *(Incorporated by reference to the Form 10 filed on April 22, 2016)* |
| 3.2 | By-Laws *(Incorporated by reference to the Form 10 filed on April 22, 2016)* |

| 10.1 | Digifonica Share Purchase Agreement *(Incorporated by reference to the Form 10 filed on June 14, 2016)* |
| 10.2 | Incentive Stock Option Plan* |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 32.1 | Certification by the Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002* |

*\* Filed herewith*

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|                        | **VoIP-Pal.Com Inc.**                          |
|------------------------|------------------------------------------------|
| Date: January 12, 2018 |                                                |
|                        | By: */s/ Emil Malak*                           |
|                        | Emil Malak                                     |
|                        | Chief Executive Officer                        |
| Date: January 12, 2018 |                                                |
|                        | By: */s/ Barry Lee*                            |
|                        | Barry Lee                                      |
|                        | Chief Financial Officer                        |

34